UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KING-INDIANA FORGE, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:07-cv-341- SEB-WGH |
| | ) | |
| MILLENIUM FORGE, INC., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, King-Indiana Forge, Inc. ("King"), is a steel forging manufacturer located in Muncie, Indiana.  In addition to other products, King manufactures spindles that are utilized in the axle and suspension systems of heavy truck trailers.  In 2006, spindle manufacturing made up more than forty percent of King's total sales, and the customer buying the majority of those spindles was Hendrickson International ("Hendrickson").  In 2006, King sought a purchaser for the business and retained MelCap Partners, LLC ("MelCap"), an investment banking and financial advising firm, to represent it in connection with a potential sale.  Among several potential purchasers of the business, MelCap identified Defendant, Millenium Forge, Inc. ("MFI"), another forging operation which also manufactured products for the heavy truck trailer and other similar industries.

In May 2006, as part of a mass solicitation sent to potential interested parties, Sean Demlo of MelCap provided James Mitchell at MFI a packet containing certain general information about a forging business that was for sale in the Midwest, without identifying King by name. At that time, MFI had for more than five years been manufacturing "spiders," another part used in truck trailer axle and brake configurations, and selling them to Hendrickson. Mitchell, the President of MFI, had spoken to representatives of Hendrickson about supplying Hendrickson with its spindle needs on more than one occasion prior to receiving the information packet from MelCap. In fact, in May of 2004, Mitchell expressed to others at MFI his belief that MFI could profitably take on the manufacturing of spindles and described for them a preliminary outline for doing so.

In 2004, MFI purchased and began installing a 2,500-ton press which was ready to operate by spring of 2005, and which enabled it to take on projects such as spindle manufacturing for Hendrickson. Following an open-house, held in part to make public the new press at MFI's Louisville, Kentucky, facility, a Hendrickson representative sent MFI a drawing for a specific part, C-26907, which was one of several spindles Hendrickson required for its product line. MFI quoted a price for the referenced part to Hendrickson in August 2005, based on Mitchell's idea of "forging the part short" in the 2,500-ton press and then extruding (lengthening) the part in an auxiliary long-stroke press.

Although the initial information packet sent to MFI during the first week of May

2006 did not specifically identify King as the company for sale, MFI determined that the entity for sale was likely King, based on its general awareness of forging suppliers to both Hendrickson and the industry in general. In a series of e-mail exchanges sent May 10 and 11, 2006, between Mitchell and the other officer/owners of MFI, they speculated that King was hard pressed financially, Hendrickson was worried about its supplier's continued viability and, therefore, King was seeking an owner who was willing to provide greater financial backing and stability to the business. On May 11, 2006, Mitchell sent an e-mail to Sean Demlo at MelCap expressing MFI's potential interest in acquiring the "unidentified" forging company which MelCap was representing.

    The following day, May 12, 2006, Demlo sent to Mitchell a confidential executive summary which, in addition to identifying King as the prospective seller, provided considerably more information about King, its business, its clients and its financial status. This prompted a further exchange of questions and answers between MelCap and MFI, eventually leading to a May 29, 2006, e-mail from Mitchell to Demlo, formally expressing MFI's interest in acquiring King and setting out a price range which MFI represented could only be narrowed after receipt by MFI of more information. Mitchell's e-mail concluded as follows:

> We are hopeful that this Indication of Interest range will provide Millenium Forge with an opportunity to visit King, tour the facility and to meet the management.
>
> Millenium Forge has the financial capacity to undertake this transaction.

> Millenium Forge is interested in King Forge as a going concern and to "build the business" on the site if that turns out to be practical and appropriate.

On June 16, 2006, Hendrickson issued a purchase order to MFI for $40,000 to cover the bolster development that would allow MFI to progress towards manufacturing the C-26907 trailer spindles.

Shortly thereafter, on June 19, 2006, MFI executed a confidentiality agreement as required by MelCap and King, which allowed MFI employees Dave Lauer (CFO), Dave Boettcher (Sales VP), Greg Poppy (Engineering Manager) and Dan Gonring Technical Director) to tour King's facility in Muncie.  During the tour, the MFI employees observed in detail the spindle forging process at King, which included its forging of a spindle for Hendrickson which was smaller than the C-26907 part for which MFI had recently received the $40,000 purchase order.[1]  Gonring and Poppy asked technical questions regarding King's forging processes, took notes and observed closely the press operator and spindle forging process.

Following their inspection of the spindle forging process and their tour of three of the six buildings which comprised the King complex, the MFI employees caucused for about twenty minutes after which they informed the King representatives that they did not think that MFI would be pursuing further the purchase, but that they needed to discuss the

---

[1] Though not the part being manufactured that day, King also forged the C-26907 spindle for Hendrickson during that time period

circumstances with Mitchell. The MFI employees cite the potential expansion of the Muncie facilities as the primary reason for MFI's initial interest in purchasing King; however, when they discovered that the facilities were in poor condition, they claim to have been disappointed and lost interest in following through on the purchase.

A few days following the MFI employee's visit, Mitchell sent an e-mail to Demlo containing the following assessment:

> Our team from Millenium Forge felt that they had a good opportunity to review the "macro situation" at King Forge. Here is a very condensed version of our review:
>
> 1. Generally liked the management team (young enthusiastic)
> 2. Much of the equipment was "tired". E/g/ gas heating is not cost effective vs induction heating.
> 3. The hammer shop area was quite distressed.
> 4. The site was inefficient with the rail running through it.
> 5. Most of the manufacturing buildings were in need to (sic) maintenance/cleaning etc.
> 6. The "base work load" was quite thin and highly vulnerable to customer resourcing if King's viability is perceived as a "risk"
> 7. Office was "good"
> 8. Inadequate die making support on site.
> 9. Heat treatment had been abandoned.
> 10. Finishing area (shot blasting etc.) was OK.
>
> The overall impression of King Forge is that the business has suffered from years of "inadequate investment." In order for the KF site to become "world class," a period of rebirth is required. Beyond the purchase price, we would estimate $10 million to upgrade the "business." (Improving buildings, adding die making, adding HT, installing induction heaters, rebuilding primary equipment)
>
> As a result of high initial investment, Millenium Forge will decline further interest in KF.

MFI continued to work toward becoming a spindle supplier for Hendrickson, including designing a process to forge the C-26907 spindle, utilizing MFI's new 2,500-ton press and a long stroke press to extrude the short-forged spindle.  Dan Gonring oversaw the project for MFI.  On January 12, 2007, MFI successfully forged its first Hendrickson C-26907 spindle and Gonring sent a congratulatory e-mail to MFI management, which stated in part:

> Today Millenium Forge reached a new milestone with the first successful prototype run of Hendrickson spindles.  This is in no way a small feat.  Spindle production is a highly technical, engineering laden project.  There are but a few forgers willing to take on a task like this.  It is important to note that we started this project without any experience, without the proper equipment etc., and in a matter of months completed the task on time.  This is a tribute to anyone involved in this project.

King filed this lawsuit against MFI on March 14, 2007, claiming that MFI breached the confidentiality agreement and engaged in the unauthorized use of trade secrets that had come into MFI's possession as a result of its tour of the King facility. Count I of King's complaint against MFI alleges a misappropriation of trade secrets, in violation of the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code § 24-2-3-1 to 24-2-3-8.  Count II asserts a breach of contract, and Count III is a common law claim for misappropriation of confidential information.  MFI has filed the pending summary judgment motion, arguing that it designed its own process for manufacturing the Hendrickson spindles and that there is no evidence of misappropriation on its part.  It also claims that King's common law claim is preempted by the IUTSA.  The motion is fully

briefed and ready for ruling by the Court.

### *Summary Judgment Standard*

Summary judgment is appropriate when the evidence establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 247-52. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

*Analysis*

A protectable trade secret under the IUTSA is defined as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind. Code § 24-2-3-2.

Misappropriation of a trade secret occurs when someone acquires or uses a trade secret with knowledge that it was obtained improperly. *Weston v. Buckley*, 677 N.E.2d 1089, 1092 (Ind. App. 1997). A process can be a trade secret, and such protectable process may contain elements which are readily ascertainable on their own, but in combination not easily capable of reproduction. *Id.* Determining whether something is a trade secret is a fact sensitive assessment, but, ultimately, it is a matter of law for the court to decide. *Steve Silveus Ins., Inc. v. Goshert,* 873 N.E.2d 165, 179 (Ind. App. 2007).

We have no difficulty concluding that the process which King developed for forging spindles is, in fact and law, a trade secret. That process contains numerous steps, most of which individually are admittedly not unique to King's forging process. Nevertheless, the record is clear that King spent considerable amounts of money and nearly two years of experimentation in adapting these otherwise common procedures into a combination of manufacturing steps which constituted its forging process. In so doing, it became the only company in the United States (and one of just three in the world) that could hot forge a long "near net trailer axle spindle," prior to MFI's process development for forging spindles. In any event, MFI's manufacturing process is not identical to King's process, which fact complicates the Court's task in attempting to determine whether, as a result of MFI's visit to the King facilities, MFI was able to incorporate into its process a combination of steps derived from its knowledge of the King process and thus allowed MFI to shortcut its own developmental process in reaching a similar result.

MFI strenuously contends that King lacks any direct evidence that MFI used any of what it learned from visiting the King facility in developing its spindle forging process. While King claims to have both direct and circumstantial evidence of misappropriation, MFI is correct: All of King's evidence is entirely circumstantial. Nevertheless, the lack of direct evidence does not foreclose a determination that MFI utilized knowledge of the King process which, absent its visit to King's plant, would not otherwise have been readily ascertainable. Circumstantial evidence can be as probative as direct evidence and sometimes is even more reliable. *Murrell v. Frank,* 332 F.3d 1102, 1117 (7th Cir. 2003).

When viewed in a manner that most favors King, the non-movant, the following evidence drawn from the submissions by the parties supports its contention that MFI utilized King's spindle forging processes:

1. Those in charge of developing the manufacturing process at MFI had no prior experience in forging spindles or long forgings.

2. MFI had a purchase order to begin production of spindles, at which time it knew that King was forging spindles for Hendrickson, and had told MelCap that it was interested in purchasing King because MFI was operating at near capacity at its Louisville facility, when, in fact, the Louisville facility was not operating near capacity.

3. Key MFI personnel who visited King spent most of the time they were on the King premises observing the spindle forging process, and made specific inquiry regarding the processes, including taking notes.

4. MFI did not begin developing its spindle manufacturing process until after it had visited King, yet it was able to complete in a mere six months what it had taken King more than two years to develop.

5. Dan Gonring admits that in his to others at MFI who were assisting him in

>	the design of MFI's spindle manufacturing process, he referred to certain observations that he had made while he was visiting the King facility. Those references included:
>
>>	June 23, 2006:
>>	"I have seen these pierced in a trim press with 14" stroke. The bottom die did not pivot however. Please verify what stroke press we will need."
>>
>>	July 10, 2006:
>>	"I believe you said the stroke was 17" on the press you ID'd. If so it should be sufficient. The current method was on a 300T, 14" stroke press."

6.	In December 2006, another e-mail exchange between Gonring and an MFI employee who was assisting in development of the manufacturing process discussed a size and weight discrepancy in the billet used at the beginning of the forging process as well as the weight of the finished spindle MFI was producing for Hendrickson. King attributes this discrepancy to the fact that MFI started out trying to use the exact same size billet it had observed King to use for its during MFI's visit, which spindle was smaller than the C-26907.

7.	King's expert testified that the spindle manufacturing process developed by MFI is identical or substantially similar in most elements to King's process, which similarities include some elements that are highly unique and not commonly known.

From this evidence, it is clearly possible for a jury to conclude that MFI has misappropriated King's trade secrets. That is not to say there is no evidence to support a contrary conclusion. It is undisputed that Mitchell and others at MFI had a great deal of forging experience, in general, and that Mitchell, in particular, had experience in the manufacture of a product that required similar forging processes. Mitchell had sketched a rough concept of how a spindle would be forged on a 2,500-ton press long before MFI

representatives went to the King facility. In addition, King's expert has conceded that no single step in the process used by King is completely unique and that there are a number of important distinctions between the two processes used by King and MFI. But we do not weigh the evidence at the summary judgment stage. This may be a case where, despite the similarities in procedures between the two manufacturers and MFI's access to King's protected processes, a jury will choose to believe the testimony of MFI's witnesses, who claim that they developed their forging process without utilizing any trade secrets belonging to King. Or, as we have noted, a jury could conclude otherwise. We must leave these factual disputes to a jury to resolve.

MFI is entitled to summary judgment on Count III of King's complaint, which asserts a common law claim of misappropriation of confidential information. We agree with our sister court in the Northern District of Indiana in concluding that the IUTSA preempts any common law claim under Indiana law for misappropriation of confidential business information, beyond a breach of contract. *See Patriot Homes, Inc. v. Forest River Housing, Inc.,* 489 F.Supp.2d 865, 869-70 (N.D. Ind. 2007).

## Conclusion

Other than King's common law misappropriation claim, clearly this is not a case subject to summary judgment. Material facts remain in question and open to interpretation. Accordingly, Defendant's Motion for Summary Judgment (Doc. #78) is

GRANTED IN PART as to Count III, but DENIED in all other respects.

IT IS SO ORDERED

Date: 03/18/2009

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas J. Collin
THOMPSON HINE LLP
tom.collin@thompsonhine.com

Michael D. Huitink
GODFREY & KAHN, S.C.
mhuitink@gklaw.com

John Lentz Kirtley
GODFREY & KAHN
jkirtley@gklaw.com

James L. Petersen
ICE MILLER LLP
james.petersen@icemiller.com

Julianna Marie Plawecki
ICE MILLER LLP
julianna.plawecki@icemiller.com

Jennifer Smith Roach
THOMPSON HINE LLP
jennifer.roach@thompsonhine.com

Joel E. Tragesser
FROST BROWN TODD LLC
jtragesser@fbtlaw.com

Karen A. Waple
GODFREY & KAHN, S.C.
kwaple@gklaw.com